Filed 5/25/22  P. v. Wolfe CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>VANESSA WOLFE,<br><br>Defendant and Appellant. | F081098<br><br>(Super. Ct. No. BF158097B)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Charles R. Brehmer, Judge.

Byron C. Lichstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Sally Espinoza and Robert C. Nash, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant Vanessa Wolfe and her boyfriend, Eddie Leyva, were arrested in 2014 in connection with the death of their three-month-old daughter, Adenalie. They were jointly charged with second degree murder (Pen. Code, §§ 187, subd. (a), 189, subd. (b); count 1),[1] assault on a child causing death (§ 273ab; count 2), felony child endangerment of Adenalie (§ 273a, subd. (a); count 3), and misdemeanor child endangerment of Adenalie's three siblings (§ 273a, subd. (b); count 4). Defendant and Leyva were tried together before separate juries. Leyva is not a party to this appeal.[2]

After jury selection but prior to the commencement of evidence, the trial court dismissed counts 3 and 4 on the prosecution's motion. (Former section 1385.)[3] Defendant was subsequently convicted on count 1 and count 2, as charged. The trial court sentenced defendant to a mandatory term of 25 years to life on count 2 for assault on a child causing death and imposed a mandatory term of 15 years to life on count 1 for murder, stayed under former section 654.[4]

On appeal, defendant claims that the trial court erred in limiting her cross-examination of the prosecution's medical expert regarding portions of an email he sent and information on his LinkedIn profile page, in violation of her state and federal constitutional rights. If we deem her claim forfeited in whole or in part, she argues trial counsel rendered ineffective assistance of counsel. Defendant also claims trial counsel's

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] During jury deliberations, the trial court declared a mistrial as to Leyva. His appeal following retrial and conviction is pending in case No. F081984. (Evid. Code, §§ 452, subd. (d), 459.)

[3] Section 1385 was amended effective January 1, 2022, by Senate Bill No. 81, Statutes 2021, chapter 721, section 1 (2021–2022 Reg. Sess.).

[4] As addressed in part IV. of the Discussion, section 654 was amended effective January 1, 2022, by Assembly Bill No. 518, Statutes 2021, chapter 441, section 1 (2021–2022 Reg. Sess.) (Assembly Bill 518).

failure to impeach one of the trial witnesses with his criminal history constituted ineffective assistance of counsel, and, cumulatively, these trial errors were prejudicial. In supplemental briefing, defendant requests remand for resentencing given the amendment of section 654 by Assembly Bill 518.

The People concede defendant is entitled to remand under Assembly Bill 518, but otherwise dispute her claims. They raise forfeiture regarding the trial court's rulings, but also contend the claims fail on their merits.

We find no error with the trial court's exclusion of certain information from the prosecution expert's email and LinkedIn page, and we reject defendant's claim that trial counsel's failure to impeach a witness with his criminal history was ineffective. Further, even if we assume error occurred, the errors complained of were harmless. However, we shall remand this matter for resentencing under Assembly Bill 518.

## FACTUAL SUMMARY

### I. Prosecution Case

### A. Events Prior to Adenalie's Death

Adenalie was born prematurely at 36 weeks on July 22, 2014. She weighed five pounds, and developed some complications commonly associated with gestational diabetes during pregnancy, including respiratory distress syndrome (RDS), which is a delay in lung maturity. Adenalie also had episodes of apnea, which is the cessation of breathing for more than 20 seconds; oxygen desaturation; bradycardia, which is a slower heartbeat that typically follows the apnea; and some feeding issues, including tiring and failing to complete her feedings. She was in the neonatal intensive care unit for 26 days, and during that time was treated via a tube to her lungs that delivered medication, machine support, a feeding tube, and an IV for nutrition.

Although infants with RDS are more susceptible to lung infections, none of Adenalie's initial complications resulted in any long-term issues and her X-rays were clear of fractures. She was discharged from the hospital on August 18, 2014, with a

prescription for an iron supplement. She weighed six pounds two ounces, and although she gained less weight than she should have, she was healthy without any remaining complications or concerns, and she did not have a bacterial infection or pneumonia. Standard discharge instructions included following up with a primary care physician two to four days after discharge.

At the time of Adenalie's discharge, defendant and Leyva had been living with Leyva's sister, R.L., for a few years. Their one-year-old son, O., and defendant's son, F., age three, and daughter, S., age seven, also lived with them. Several weeks after Adenalie's discharge, R.L. gave up her apartment and defendant, Leyva, and the four children stayed wherever Leyva's mother, L.L., was, either at her mother's house or with her fiancé, D.B., at his apartment.

On September 19, 2014, defendant and Leyva took Adenalie to the emergency room and reported she was becoming fussy around 5:00 p.m. and had not had a bowel movement in three days. Adenalie weighed seven pounds one ounce, her vital signs were stable, she was alert and responsive, and the examining nurse did not note any abnormalities. Defendant reported she had changed Adenalie's formula, which can sometimes either cause or ease constipation. Adenalie received a glycerin suppository, and the hospital's standard discharge instructions included following up with a primary care doctor within a few days and returning to the emergency room if the problem continued.

On October 29, 2014, the day before Adenalie died, defendant, Leyva, and their children were at Leyva's maternal grandmother's house with L.L. R.L. came by for an hour or so to visit. Defendant and Leyva were outside, and L.L. was holding Adenalie. During the hour or so R.L. was there, Adenalie cried a lot, and R.L. held her and tried to soothe her for most of the visit. At some point, Adenalie was in her carseat attached to the stroller and defendant was rocking the stroller. R.L. testified that defendant was

4.

frustrated with Adenalie and tried to give her a pacifier. R.L. thought Adenalie might be hungry, but defendant said she tried and Adenalie would not take a bottle.

R.L. testified Adenalie looked tired, which R.L. thought was from crying, and she was turning away from her bottle. She was swaddled that day so R.L. did not see her arms or legs, but R.L. did not see anything wrong with her eyes or any marks on her face. Although Adenalie looked unhealthy, R.L. did not think she looked like the photo taken after her death. R.L. described Adenalie as "[k]ind of" skinny and "small again" like when she was born, and she recalled telling Sergeant Moore that Adenalie was horribly "skinny."

L.L. testified that on the night of October 29, 2014, she stayed at D.B.'s apartment and took care of Adenalie. L.L. said Adenalie cried a lot that night, but she looked healthy, there were no bruises on her face, and she drank four ounces of formula, which was the amount of her regular feeding. When L.L. left for her mother's house between 7:00 and 9:00 a.m. the next morning, Adenalie was in her swing in the living room and L.L. kissed her on the head.

### B. Adenalie's Death

On October 30, 2014, D.B. returned home around 11:00 a.m. As he passed through the apartment, he saw the other children around but not Adenalie. He turned on the water to shower when he heard defendant scream. She was holding Adenalie and said Adenalie was not breathing. D.B. and defendant tried to resuscitate Adenalie, but she felt cold to D.B. and he called 911.

Paramedics and police arrived just after 12:00 p.m. Adenalie was not breathing and had no pulse; she appeared very skinny and malnourished, with every rib in her chest visible; her eyes were crusty; and she had two visible bruises on her face, which stood out to one of the paramedics as a "red flag" for possible child abuse. Adenalie was already in rigor mortis, had lividity present on the back of her legs and there was a white cluster of what was later determined to be fly eggs visible on the back of her tongue. No precise

5.

time of death was established.  However, the responding paramedic thought she had been dead for at least four to six hours.

In the living room of the apartment, there was a mattress on the floor, a loveseat, and two dirty chairs pushed together as makeshift crib with some animal feces on it.  A baby swing was approximately 8 to 10 feet away, in the kitchen.  The apartment floor was "[f]ilthy," but there was food in the cabinets and refrigerator, diapers, and infant formula.  Police found a pink baby bottle fashioned into a bong used for smoking narcotics with some residue in it.

Although a paramedic testified that defendant was not crying, one of the police officers who was at the scene testified that defendant was upset and crying.  Leyva was not there.  Defendant said Leyva left on foot and she provided a description of him.  He was subsequently arrested a number of blocks away carrying two young children.

At the scene, defendant told a police officer that Adenalie was born with a breathing condition and had to stay in the hospital for a month, and that she had not been eating properly for the past two weeks.  Defendant reported her last contact with Adenalie was at approximately 11:00 p.m. the night before, when she put Adenalie in the swing in the kitchen to sleep.  Defendant then slept the entire time until she checked on Adenalie around 13 hours later and found she was not breathing and was cold to the touch.

Approximately 30 minutes to an hour later, while waiting for detectives to arrive, defendant told the officer, "'I know I'm not supposed to say this because I'm afraid what's going to happen but Eddie has choked her … in the past.'"  Defendant said she saw Leyva pick up Adenalie and strangle her on three or four occasions, and the two bruises on Adenalie's face were from Leyva strangling her.  Defendant did not report the incidents because Leyva had also strangled her in the past and he threatened to "put her underground."  The officer did not notice any visible marks on defendant.

6.

## C. Defendant's Statement to Police

Later that day, defendant was read her *Miranda*[5] rights and her audio-video recorded statement to detectives was played for her jury.[6] Defendant told detectives that Adenalie was five pounds seven ounces when she was born and six pounds when she was released. Adenalie had not seen a doctor since her discharge, but she was healthy and had been eating four ounces of formula every two to three hours. More recently, however, she was taking only two ounces of formula at a time.

Initially, defendant stated that the night before Adenalie's death, defendant put her to sleep in her swing around 11:00 or 11:30 p.m. L.L. had left for her mother's house after arguing with D.B. and was not there that night. When defendant woke up sometime between 10:00 and 11:00 a.m., Leyva was up with the other kids. He told defendant he checked on Adenalie at 7:30 or 8:00 a.m. and she was sleeping. When defendant later checked on Adenalie around 12:00 p.m., Adenalie was cold and was not breathing. Adenalie was on her side in the swing with a pacifier in her mouth, like defendant left her the night before. After defendant tried to resuscitate Adenalie, D.B. called 911 and handed her the phone.

Subsequently, defendant told detectives Adenalie started crying around 3:00 a.m. and she gave Adenalie a bottle, which she propped up on a blanket. After Adenalie started whining, defendant got up, took the bottle out, gave her a pacifier, and started the swing. Defendant said Adenalie drank two ounces of formula at that feeding.

Later, defendant stated Adenalie last ate around 10:30 the night before, and she put a bottle in with Adenalie in the swing. Defendant also stated that she was actually up until after 4:00 a.m. playing the Xbox with Leyva. The three older children were still up as well. Defendant could hear Adenalie make noise and then stop so defendant thought

---

[5]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[6]     Leyva's jury was not present.

Adenalie was fine and did not check on her. Defendant said she went to sleep at 4:08 a.m. and slept until 10:00 or 10:30 a.m. When defendant woke up, Leyva told her he had checked on Adenalie and she was fine, and when defendant later got up to check on Adenalie, Leyva said she was fine and to leave her.

Defendant disclosed to detectives that Leyva would choke Adenalie because he had a temper, was bipolar, and would get upset when Adenalie cried. Defendant later said Leyva choked Adenalie around four times and he would get frustrated every time Adenalie cried. Defendant then disclosed that Leyva also shook Adenalie sometimes and would say, "'Shut the fuck up. You cry too fucking much.'" He would tell defendant that Adenalie was his daughter, and he could do whatever he wanted to her. When Leyva shook her, Adenalie would stop crying, become quiet, stare, and lick her lips. Leyva would then put Adenalie down. Leyva threatened to kill and bury defendant if she ever told anyone.

Defendant said that Adenalie was fine until Leyva started choking her about a month after her release from the hospital. Adenalie stopped eating normally about two weeks after Levya started choking her and squeezing her, which defendant stated he was doing approximately twice a day, every other day. Leyva also swaddled Adenalie too tightly, pulling on the blanket after wrapping her, and Adenalie would make the same sort of noise she made when Leyva choked her.

Defendant denied she ever choked, squeezed, or shook any of the children, including Adenalie. Defendant said the last time Leyva shook or choked Adenalie was about a week prior to her death, but she also said that around three days before Adenalie died, she noticed Adenalie's eyes were bloody under the lower lid and she thought Leyva did something that made the blood vessels break. Defendant told detectives Adenalie had been calm for the past week, but would cry a "[t]ypical" cry, "like a little kitten." Defendant "guess[ed]" Leyva hurt Adenalie when he choked her or squeezed her stomach, which he said was to help pass gas, because Adenalie made a noise like she was

8.

having trouble breathing when she was being squeezed and she cried hysterically whenever defendant would move her. Defendant said Adenalie cried in pain like that when moved every day, including the night before she died.

Defendant stated she told Levya that Adenalie was probably crying and not eating like she used to because her throat or stomach hurt. Defendant noticed that sometimes when Adenalie was fed, she made gurgling sounds and the formula would sit in her throat, like she was having difficulty swallowing. Other times Adenalie seemed able to swallow the formula. Defendant said Adenalie only drank a very small amount the night before her death, not two ounces like defendant initially told detectives.

Defendant said Leyva never did anything to Adenalie in front of his sister or mother. However, about a week before Adenalie died, defendant told L.L. about it. L.L. did not respond at the time, but Leyva later got mad at defendant for saying something so she knew L.L. must have talked to him. That was the only time defendant told anyone what Leyva was doing to Adenalie.

Defendant told detectives that Leyva got upset if his mother or defendant held Adenalie too much, and he was jealous if defendant spent time with Adenalie. She stated he told her that if he wanted to murder Adenalie, he would, and there was nothing she could say about it because he was Adenalie's father.

In addition to hurting Adenalie, Leyva socked S. once, but not full strength, slapped S. by covering her mouth, did something to S.'s back, and spanked both F. and S. Leyva also choked defendant when they argued. Defendant said Leyva last choked her about five days before Adenalie died, and he socked her during an argument about four days before.

Defendant claimed that she changed Adenalie's diaper every two hours, and that Adenalie peed and pooped multiple times a day. She admitted she did not change Adenalie's diaper the night she died, however.

9.

Defendant denied she used drugs or drank alcohol, but she smoked cigarettes, including during her pregnancies. Defendant said she was the only sober adult in the house, and Leyva, D.B., and L.L. were going into the bathroom to smoke methamphetamine every two or three hours.

### D. Witness Testimony on Adenalie's Care

R.L. testified that during the time defendant, Leyva, and the children lived with her, she was gone during the day, but would take care of Adenalie at night. R.L. said Leyva was afraid to hold Adenalie since she was so small and defendant did not seem to want to take care of Adenalie. R.L. worried about Adenalie because defendant and Leyva would argue over who was going to feed Adenalie or change her diapers. Defendant usually took care of Adenalie, however, and when R.L. told a detective that Leyva took care of the baby, she meant one-year-old O.

R.L. had six children who were removed from her care due to her methamphetamine use. As a result, she was gone during the day taking classes to get her children back. When she would return home, she would find defendant and Leyva outside smoking while Adenalie was inside alone. This upset R.L. because defendant and Leyva knew they were not supposed to smoke around Adenalie and she would scream at them over it. Defendant never responded, but Leyva would say that he knew and was going to go wash his hands and change his clothes. R.L. also testified that Adenalie needed to be held when fed and she would return home to find Adenalie in her swing with her bottle propped up, which upset R.L.

R.L. described Adenalie as quiet and playful during the time she lived with R.L. She did not cry a lot. Once the household split up, R.L. did not see defendant, Leyva, and the children very often, but when she did, Adenalie had a painful cry. R.L. saw Adenalie around two times the last week of her life, and Adenalie cried like she was in pain during that time.

D.B. testified that he did his own thing, did not like to be home, and did not really pay attention to what was going on with Adenalie. He thought she should not have been home, however, because she was sick, too small, and cried all the time like she was in pain. D.B. stated that L.L. would end up with Adenalie, and would talk to her and calm her down while defendant did nothing. Defendant would also cuss Adenalie out, call her "a little bitch," and tell her to shut up. D.B. said Levya was "not the best," but D.B. gave him credit for taking care of the kids and said Leyva would try to comfort Adenalie. D.B. admitted he did drugs on and off for a long time, but testified he used methamphetamine with Leyva only one time and it was not inside the house or in front of the children.

L.L. testified she took care of Adenalie often and although Adenalie was too young to hold her own bottle, she drank from it. L.L. denied that Adenalie cried a lot and stated she did not recall telling Sergeant Moore otherwise. L.L. admitted she knew Adenalie was sick, but said Adenalie was born early and not fully developed. L.L. denied Adenalie looked very skinny before she died, and L.L. said she did not recall telling Moore that Adenalie looked like a skeleton.

L.L. said that D.B. was using methamphetamine in October 2014, but Leyva was not. She did not recall telling Sergeant Moore that Leyva smoked methamphetamine the night before Adenalie died, but conceded he "probably" smoked it a few times the last week of her life. She also said that she was "[p]robably" using methamphetamine as well. She said she did not use it in the house, but D.B. and Leyva did, although not in the same room as the children.

Sergeant Moore later testified that he interviewed L.L. the day Adenalie died, and she told him that Adenalie did not look healthy and looked like a skeleton. She also told him that Adenalie was crying a lot the night before she died and was not eating, and that Leyva was using methamphetamine during that period.

R.L., D.B., and L.L. testified they never saw Leyva act physically abusive toward Adenalie. D.B. also testified he never saw Leyva act violently toward defendant, and he

11.

never saw defendant act afraid of Levya. R.L. and L.L. never saw defendant act physically abusive toward Adenalie, either, but L.L. said defendant would yell at F. and S. and sometimes hit them, including hitting S. once in the face. R.L. recalled telling Sergeant Moore that defendant shook Adenalie too hard, but she explained she meant defendant was too aggressive when she was burping or trying to soothe Adenalie.

Defendant's two oldest children, S. and F., testified at trial. Both testified they loved defendant and wanted her to come home. S., then in sixth grade, denied defendant ever punched her or F. in the face, or abused her, F., or O. in any way. F., then in third grade, also denied defendant ever hit him. He said he did not remember what happened to Adenalie or if he told police the truth. Although he stated he remembered Leyva doing something to Adenalie, he could not or would not say what, and he said he did not remember defendant choking Adenalie.

A social worker and forensic interviewer with the county also testified. She interviewed F. four days after Adenalie died and their videotaped interview was played for the jury prior to her testimony. During that interview, F. said Leyva got mad and "choked baby girl" at "her grandma house." He also said the baby cried a lot, and Leyva "[h]urt baby girl."

### E.      Forensic Pathologist's Testimony

Adenalie's autopsy was conducted on October 31, 2014, by Dr. Eugene Carpenter, a forensic pathologist with the Kern County Sheriff's Department, Coroner Division. Dr. Carpenter explained that "[t]he purpose of the autopsy… is to determine the cause of death and the manner of death." The five manner-of-death categories are undetermined; natural; accident; suicide; and homicide, which is a medical term rather than a legal one and means the death was partially or fully caused by another.

Adenalie was around three months one week old when she died. She was 50 centimeters in length and weighed about four and one-half pounds. Externally, Adenalie presented as if she "starved to death" She was "only skin and bones," with protruding

12.

ribs and no body fat, and she showed physical signs consistent with "an extreme fatal level of dehydration." She had "a collection of scarring" on her left cheek; two prominent bruises on her left cheek, one near her mouth and one near her eye; a circular abrasion on her chin the size of a small nail; and, above that, a shallow cut. She also had some scabbed abrasions above her pubic bone consistent with blunt force abrasions or insect bites.

Internally, Adenalie had a prominent bruise from an impact injury on the back of her head severe enough to slightly bruise the tissue on the surface of the skull, but there was no sign of fracture or brain injury. Adenalie had 16 fractured ribs, many double fractured, "in a pattern of violent shaking" and "not the type seen in automobile accidents."[7] The rib fractures had started to form calluses as part of the healing process so were, very roughly, between 10 days and three weeks old. She also had a severe, acute infection in her right kidney, which was visibly swollen and exuded pus. Adenalie tested positive for influenza A, although Dr. Carpenter did not see any signs she had the flu, and she had an unknown level of methamphetamine in her system.

Adenalie had approximately one teaspoon of urine in her bladder. Dr. Carpenter noted that her diaper was "moderately soiled," but he did not weigh it or note whether it was soaked with urine. He explained that the kidneys must have a minimal amount of urine to sustain life and to keep the kidneys functioning, the body will steal water from wherever it can, including from air that enters the lungs or from the gut. Adenalie also had one gram of soft stool in her large intestine, which Dr. Carpenter testified is about the size of four grains of rice or a pencil eraser; and she had approximately six milliliters of mucus in the intestine, which is produced by the body and does not come from feeding.

---

**7**      Dr. Carpenter did not opine that Adenalie suffered from "acute" or "fresh" shaken baby syndrome; there were no signs of retinal hemorrhaging, brain swelling, or brain bleed. However, he stated her case showed "signs of being one of the majority of the tragic cases" where the shaken baby did not die and doctors later discover mental damage.

After Dr. Carpenter sectioned the lobes of Adenalie's lungs and examined them microscopically, he found "acute" bacterial pneumonia in one lobe, which he explained meant "[e]arly stage" and evidenced by white blood cells called "polys" rather than lymphocytes, which are seen with longer term, chronic infections. He testified that rib fractures are a "classic set up to develop pneumonia" because the fractures result in shallow breathing, which impairs the lungs' ability to clean themselves. In his opinion, the pneumonia finding connected Adenalie's chest trauma to her death because the rib fractures led to pneumonia, which then led to the kidney infection, causing her death and allowing for the conclusion that the manner of death was medical homicide. Dr. Carpenter listed malnutrition, which alone was lethal; acute methamphetamine intoxication, based on the presence of methamphetamine in Adenalie's blood; and prematurity as other conditions. Dr. Carpenter did not know how long Adenalie had the kidney or the lung infection, but the kidney infection was consistent with days or weeks and the lung infection was consistent with at least a few days, although it could have started at the time of the rib fractures. He testified the infections and fractures were treatable.

Dr. Carpenter agreed it was possible the kidney infection caused the pneumonia because a severe kidney infection can enter the bloodstream and then the lungs. However, because he did not see any sign of a bladder infection, he concluded the lung infection entered the bloodstream and then the kidney, and he stated this sequence of events would not be unusual. He also stated that Adenalie's appearance was consistent with having starved to death over many days; and her malnourishment was consistent with having kidney and lung infections and going many days without food and water.

In early November 2014, shortly after Adenalie's autopsy but before he discovered she had pneumonia in one lobe of her lung, Dr. Carpenter sent someone in the coroner's office an email. He wrote, "I found probable lethal level right kidney infection signs which would explain the appearance of neglect and why the infant wasn't feeding." He

also wrote, "The ribs have been fractured in the past and there is blunt trauma to the head but it will be questionable as whether and how that may have contributed to the death." "It also may be, probably will be, that the chest trauma and prematurity will be on line 112, other conditions." "[T]here is blunt trauma to the head but it will be questionable as [to] whether and how that may have contributed to the death." "The head trauma can be argued to be where th[e] sick baby lay on its head for a long time while sick." "The mode can't be natural but probably will be undetermined."

Dr. Carpenter explained that at the time, he did not know about the pneumonia and was considering whether Adenalie's death was undetermined or possibly a homicide, and he wanted to express his doubt regarding whether a smothering occurred. He stated he feared it was a homicide, but also feared there might be another explanation for Adenalie's severe malnourishment, and he wanted to express that hesitation. He further explained that because the chest trauma was unnatural and contributed to Adenalie's death, her death could not be considered natural and would probably be a homicide.

Regarding his comment on Adenalie's head trauma, he said he was simply expressing what someone might argue, but he did not state in the email that the injury was due to Adenalie lying on her head for a long time and that is not what occurred, in his opinion. He explained that bedsores start on the surface and work their way inward; they do not show signs of crushed bleeding tissue.

## II.    Defense Case

Dr. Katherine Raven, a forensic pathologist for Sacramento County and part-time consultant, testified on behalf of both defendant and Leyva. Dr. Raven disagreed with Dr. Carpenter's opinion that the manner of Adenalie's death was medical homicide based on a link between the rib fractures and the pneumonia. She also disagreed with his sequencing of events.

Dr. Raven testified it is more unusual for a lung infection to infect the kidney, although it can occur. Instead, the kidney is usually infected first, and the infection then

15.

enters the bloodstream and seeps into the lungs. Dr. Raven disagreed with Dr. Carpenter's visual rule-out of a bladder infection, and she explained that the bladder does not change due to infection; the urine has to be tested. Dr. Raven testified that Adenalie's kidney and lung infections were both acute, were probably one to three days old, and were probably linked. However, because a more severe infection usually predates a less severe infection and Adenalie's kidney was visibly, severely infected while her lung infection was not severe and only detectable by microscope, it was Dr. Raven's opinion that the kidney infection likely came first and led to the lung infection.

Regarding Dr. Carpenter's opinion that Adenalie's rib fractures were linked to her pneumonia, Dr. Raven explained that acute rib fractures can cause pneumonia because the pain resulting from acute fractures prevents chest and lung expansion, thereby predisposing the body to pneumonia. However, acute for a pathologist usually means under 24 hours, and she had never seen rib fractures cause pneumonia in any of the hundreds of autopsies she performed in infants and children. Adenalie's rib fractures, as evidenced by the calluses, were at least 10 days old, if not weeks old, and were not acute. She testified that the fractures were not lethal and, in her opinion, there was no way to link Adenalie's acute pneumonia to her old rib fractures.

Dr. Raven also disagreed that Adenalie's rib fractures were caused by violent shaking, as Dr. Carpenter testified. Dr. Raven testified it is "very, very rare" to see rib fractures from shaking and there was "zero evidence of shaking." If a baby is severely shaken resulting in death, there are usually immediate signs, including unresponsiveness, eyes rolling back in the head, grunting noises, inability to track with the eyes, and loss of sucking reflex. Adenalie did not have any signs of gross brain injury or hemorrhaging of the eyes, and if she was violently shaken before her death, there would be signs of injury even weeks later. Dr. Raven testified that, rather than shaking, fractures like Adenalie's occur from holding and squeezing.

16.

Dr. Raven agreed that Adenalie was severely emaciated, but the cause was unknown; it could have been from the infections or for some other reason, and she could not say when Adenalie stopped eating. Dr. Raven noted that Adenalie testified positive for the influenza A antigen, meaning she had the flu, and she had methamphetamine in her system. Dr. Raven testified it is common to get a secondary infection from the flu, and she disagreed with Dr. Carpenter's autopsy report conclusion that because Adenalie's lungs and bronchial system lacked mucus, she did not show signs of the flu. Dr. Raven testified that made "no medical sense."

Dr. Raven explained that manner of death is simply a classification on a death certificate maintained for statistical purposes, and it is based on a medical opinion rather than a legal determination. Dr. Raven described Adenalie's case as "really, really difficult," but said she would categorize it as undetermined because there were many things going on with no injury to explain the death. For a medical homicide, Dr. Raven needed to see evidence of an injury that caused the death.

Dr. Raven acknowledged Adenalie's severe emaciation and injuries, including fractured ribs, bruised cheeks, and a bruise to the back of her head, possibly from an old injury or a pressure sore. She stated, "You cannot say this is completely natural but we don't know. That's why we say undetermined." What role the methamphetamine in Adenalie's blood played was unknown, and Adenalie also had fatal "natural disease processes going on," including flu. The pneumonia was lethal if allowed to progress, but since it was small and patchy, Dr. Raven did not think it was lethal in Adenalie's case. However, she agreed with Dr. Carpenter that Adenalie's cause of death was overwhelming infection of the kidney and lung, with the malnourishment and possible dehydration contributing.

## DISCUSSION

### I.     Limitation on Cross-examination of Dr. Carpenter

#### A.     Background

In early November 2014, Dr. Carpenter drafted and sent an email to an employee within the coroner's division of the sheriff's department, with the intent that the information be disseminated to a detective. A redacted version of the email was published to the jury, and Dr. Carpenter was examined regarding his statements. The email provided in full, with the four redacted sentences italicized:

> "I found probable lethal level right kidney infection signs which would explain the appearance of neglect and why the infant wasn't feeding. Yes. The ribs have been fractured in the past and there is blunt trauma to the head but it will be questionable as whether and how that may have contributed to the death. The lead detective needs to know this. *As a criminal case this will be a weak one. I would favor releasing the parents from jail but continuing to watch over the other two children. These seem to be dangerous parents.* All we may have is clear evidence of neglect, failure to care for the infant, and mainly failure to seek medical attention for the infant in a timely manner. I no longer can suspect that the dad smothered the infant or something unknown like that. From my perspective this will be a natural death due to the acute bacterial right kidney infection with sepsis and the failure to seek medical attention. The chest trauma in the past is very severe but probably must be seen as healed and not contributing to death. The head trauma can be argued to be where th[e] sick baby lay on its head for a long time while sick. The mode can't be natural but probably will be undetermined. *Right action may be to let the parents go and do what is wise to protect the other two children.*"

The next day, Dr. Carpenter added:

> "It also may be, probably will be, that the chest trauma and prematurity will be on line 112, other conditions. Also I remember th[at] the bruises at the left face. We are waiting on pus cultures from the kidney and histology of [the] kidney and all the other organs. He can call me. Thanks."

During motions in limine, following a discussion held off the record, the trial court granted the prosecutor's request to exclude the four italicized sentences on the ground

18.

that they related to Dr. Carpenter's personal opinion rather than his medical opinion. The trial court also excluded the following information from Dr. Carpenter's LinkedIn profile page: "My main purpose is to introduce the medical community and the public to the value of the books by Alice Bailey, especially those on psychology and healing.…particularly for understanding an occult (altruistic) perspective concerning the psychological causes of disease. Of particular interest: understanding the suffering of mystics and disciples." The trial court stated that Dr. Carpenter's religious or mystical beliefs were not relevant unless they were relied on by him in reaching his medical opinion.

Defendant's counsel objected to the exclusion of the first three sentences of Dr. Carpenter's email and to the exclusion of the beliefs reflected on Dr. Carpenter's LinkedIn page. Counsel argued the matters were "highly relevant," and he wanted to cross-examine Dr. Carpenter about them.

Subsequently, the parties questioned Dr. Carpenter regarding his LinkedIn page during an evidentiary hearing. (Evid. Code, § 402.) Dr. Carpenter testified that his personal, religious, and philosophical beliefs as reflected on his LinkedIn page did not affect his performance as a forensic pathologist. On cross-examination by Leyva's counsel, he explained that he had long been interested in psychosomatic illness, and his dream had been to become a psychiatrist and psychoanalyst. He was particularly interested in Sigmund Freud and Carl Jung. However, he decided it was not practical to earn a living as a psychoanalyst; instead, he became a "workhorse" in the medical field to support his family and pursued his other interests on his own time. He testified that although he believes "the realm of psychosomatic illness" will have future application to the field of endocrinology and it presently applied to forensic psychology, he was not a forensic psychologist, forensic psychology and forensic pathology were not integrated fields, and his areas of outside interest in that subject matter did not play any role in his autopsy of Adenalie.

19.

On appeal, defendant claims her counsel should have been permitted to cross-examine Dr. Carpenter regarding his opinions that any criminal case would be weak, and that he would favor releasing the parents but watching them. Defendant contends the subject matter was proper to impeach Dr. Carpenter's trial testimony. She also contends the trial court's exclusion of Dr. Carpenter's LinkedIn page interests "usurped the jury's role as fact-finder," and the jury should have been allowed to determine whether his interests influenced his medical opinion.

### B. Legal Principles

#### 1. Restriction of Cross-examination

"'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" (Evid. Code, § 210), and "[e]xcept as otherwise provided by statute, all relevant evidence is admissible" (*id.*, § 351). Under Evidence Code section 352, "[t]he trial court retains discretion to exclude even relevant evidence when its probative value is substantially outweighed by the probability that its admission will either necessitate undue consumption of time or create substantial danger of undue prejudice, confusing the issues, or misleading the jury." (*People v. Nieves* (2021) 11 Cal.5th 404, 445 (*Nieves*).)

"[A] witness testifying as an expert may be cross-examined to the same extent as any other witness and, in addition, may be fully cross-examined as to (1) his or her qualifications, (2) the subject to which his or her expert testimony relates, and (3) the matter upon which his or her opinion is based and the reasons for his or her opinion." (Evid. Code, § 721, subd. (a).) "'"[T]he scope of cross-examination of an expert witness is especially broad"'" (*Nieves, supra*, 11 Cal.5th at p. 451, quoting *People v. Peoples* (2016) 62 Cal.4th 718, 746), and "[i]t is therefore permissible to 'cross-examine an expert witness more extensively and searchingly than a lay witness, and … to attempt to

discredit the expert's opinion'" (*Nieves, supra*, at p. 451, quoting *People v. Dennis* (1998) 17 Cal.4th 468, 519).

"[R]outine application of state evidentiary law does not implicate [a] defendant's constitutional rights." (*People v. Brown* (2003) 31 Cal.4th 518, 545, fn. omitted; accord, *People v. Thompson* (2016) 1 Cal.5th 1043, 1116.) Defendant nevertheless claims the exclusion of portions of Dr. Carpenter's email and information from his LinkedIn page violated her federal constitutional right to effective cross-examination.

"The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.'" (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678.) "'"[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, 'to expose to the jury the facts from which jurors … could appropriately draw inferences relating to the reliability of the witness.'" [Citation.] However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. [Citations.] California law is in accord. [Citation.] Thus, unless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witnesses'] credibility" [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment. [Citation.]'" (*People v. Linton* (2013) 56 Cal.4th 1146, 1188; accord, *People v. Dalton* (2019) 7 Cal.5th 166, 217; *People v. Williams* (2016) 1 Cal.5th 1166, 1192.)

### 2. Standard of Review

We review a trial court's ruling on the admission or exclusion of evidence for abuse of discretion. (*People v. Kopatz* (2015) 61 Cal.4th 62, 85; *People v. DeHoyos*

(2013) 57 Cal.4th 79, 131.) "Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113, disapproved on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151; see *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.) "When the trial court's decision rests on a question of law, however, we review its decision de novo." (*People v. Thomas* (2021) 63 Cal.App.5th 612, 626, citing *People v. Gonzales* (2018) 6 Cal.5th 44, 49; accord, *People v. Herrera* (2016) 247 Cal.App.4th 467, 475; see *People v. Seijas* (2005) 36 Cal.4th 291, 304 ["[I]ndependent review 'comports with this court's usual practice for review of mixed question determinations affecting constitutional rights.'"].)[8]

### C. Analysis

#### 1. Forfeiture

The failure to object in the trial court generally forfeits a claim on appeal and this principle is applicable to constitutional claims. (*People v. McCullough* (2013) 56 Cal.4th 589, 593; *In re Sheena K.* (2007) 40 Cal.4th 875, 880–881; Evid. Code, §§ 353, 354.) There are exceptions to this general rule, however, and courts have the discretion to consider an issue notwithstanding the failure to object. (*People v. McCullough, supra*, at p. 593; *In re Sheena K., supra*, at pp. 887–888, fn.7.)

Relevant here, "[a] motion in limine can preserve an appellate claim, so long as the party objected to the specific evidence on the specific ground urged on appeal at a time when the court could determine the evidentiary question in the proper context."

---

[8] Citing and quoting *United States v. Larson* (9th Cir. 2007) 495 F.3d 1094, 1101, defendant argues de novo review applies to her challenge to the exclusion of information from Dr. Carpenter's LinkedIn page because the trial court foreclosed "an entire 'area of inquiry' versus merely … the 'scope of questioning within a given area.'" We find no error regardless of the standard applied and, therefore, do not decide whether defendant's characterization of the issue, or her reliance on *United States v. Larson*, is persuasive.

(*People v. Solomon* (2010) 49 Cal.4th 792, 821.)  The Evidence Code only "require[s] sufficient specificity of evidence and legal grounds for the opposing party to respond if necessary, for the trial court to determine the question intelligently, and for the appellate court to have a record adequate to review for error."  (*People v. Ramos* (1997) 15 Cal.4th 1133, 1172.)

The parties disagree whether defense counsel's objection to the exclusion of portions of Dr. Carpenter's email and to certain information on his LinkedIn page during motions in limine was sufficient to preserve the constitutional claims of error she now raises on appeal.  As we conclude defendant's claims fail on their merits, we elect to resolve the claims on those grounds and do not decide whether defendant's objections were insufficient to preserve the issues for review.  (*People v. McDaniel* (2021) 12 Cal.5th 97, 132–133.)[9]

### 2.    No Error

#### a.    Dr. Carpenter's Email

We discern no error in the trial court's exclusion of the four sentences from Dr. Carpenter's email as irrelevant to his expert opinion.  Dr. Carpenter conducted Adenalie's autopsy and in addition to describing those findings to the jury, he offered his medical opinion on the manner and cause of Adenalie's death.  He explained that a homicide for purposes of categorizing the manner of death is a medical term, not a legal term, and it means partially or fully caused by others.

"'An expert witness may be cross-examined on, among other subjects, the matter upon which his or her opinion is based and the reasons for the opinion .…'"  (*Nieves, supra*, 11 Cal.5th at p. 452, quoting *People v. Coffman and Marlow* (2004) 34 Cal.4th 1,

---

[9]    Trial counsel did not object to the exclusion of the sentence, "[The] right action may be to let the parents go … [but] protect the other two children."  For the purpose of resolving defendant's claim on the merits, we include that sentence in our discussion and need not consider her related claim of ineffective assistance of counsel.

85 & citing Evid. Code, § 721, subd. (a).)  However, "[t]he purpose and permissible scope of impeachment of an expert is to call into question the truthfulness of the witness's testimony.  Impeachment is not general rebuttal."  (*People v. Bell* (1989) 49 Cal.3d 502, 532; accord, *People v. Pearson* (2013) 56 Cal.4th 393, 436.)

Dr. Carpenter was not tasked with determining the strengths or weaknesses of a criminal prosecution, or in determining whether defendant and Leyva should or should not be arrested or charged.  Any opinion he expressed on those issues was personal and unrelated to the autopsy he performed or his expert medical opinion regarding manner and cause of death.

Moreover, the lack of clarity regarding precisely what occurred in Adenalie's case was evidenced by the other portions from Dr. Carpenter's email.  His personal opinions that were excluded were based on his view, formed prior to discovery of the pneumonia, that this was a case of neglect.  As that underlying view was before the jury and subject to cross-examination, defendant was not deprived of the opportunity to explore the issue of neglect versus abuse.  Critically, the admission of the four sentences excluded by the trial court would not have "'produced "a significantly different impression of [Dr. Carpenter's] credibility,"'" which forecloses defendant's claim of constitutional error.  (*People v. Linton, supra*, 56 Cal.4th at p. 1188; accord, *People v. Krebs* (2019) 8 Cal.5th 265, 330.)

Defendant argues for a contrary result by drawing a distinction between the trial court's conclusion the evidence was not directly relevant as a medical opinion, which she concedes, and her entitlement to cross-examine Dr. Carpenter on the matter for purposes of impeachment, which she claims was error.  We are unpersuaded this is a distinction that makes a difference on this record.  "A matter collateral to an issue in the action may nevertheless be relevant to the credibility of a witness who presents evidence on an issue .…"  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9; accord, *People v. Gonzales* (2011) 51 Cal.4th 894, 923.)  Put differently, impeachment evidence *is* relevant evidence,

24.

but "[a]s with all relevant evidence, … the trial court retains discretion to admit or exclude evidence offered for impeachment." (*People v. Rodriguez, supra*, at p. 9; accord, *People v. Gonzales, supra*, at p. 923.)

The trial court was aware defense counsel desired to cross-examine Carpenter on the matter, but determined it was not relevant. As the record is devoid of any indication that Dr. Carpenter's personal opinions formed any part of or improperly influenced his medical opinion, exclusion of this evidence was not erroneous. (*People v. Smithey* (1999) 20 Cal.4th 936, 960 ["An expert witness may not be cross-examined regarding matters that are not relevant to the expert's opinion or qualifications."], citing *People v. Bell, supra*, 49 Cal.3d at p. 532 & Evid. Code, § 721, subd. (a).)

### b. Dr. Carpenter's LinkedIn Page

We also discern no error with the trial court's exclusion of evidence regarding Dr. Carpenter's interest in what the parties described as religion or mysticism and he subsequently explained was the area of psychosomatic illness. Defendant argues that these matters were "important parts of assessing Carpenter's training and his qualifications to render a credible expert opinion." As previously stated, however, Dr. Carpenter testified that the subject matter did not apply in any way to his autopsy of Adenalie and while it may apply to endocrinology in the future and applied to forensic psychology in the present, he was not a forensic psychologist, and the fields of forensic psychology and forensic pathology were not integrated.

Adenalie was only an infant and both expert witnesses agreed Adenalie's cause of death was overwhelming infection with malnutrition or starvation as a contributing factor. Defendant offers no explanation how, under these circumstances and viewed through the lens of Dr. Carpenter's hearing testimony, his outside interest in the area of psychosomatic illness was relevant to his credibility as the forensic pathologist who autopsied Adenalie. Accordingly, we reject defendant's claim of error.

### 3. Any Error Harmless

Nor are we persuaded that the exclusion of the email or LinkedIn page evidence was prejudicial. Even if we assume error, it was harmless because "it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*People v. Merritt* (2017) 2 Cal.5th 819, 831; accord, *Neder v. United States* (1999) 527 U.S. 1, 15–16, 18; *People v. Gonzalez* (2012) 54 Cal.4th 643, 663).

Defendant argues that the excluded evidence was crucial for impeaching Dr. Carpenter, and "[c]reating reasonable doubt about Carpenter's conclusion that the death stemmed from abuse would have created reasonable doubt about [defendant's] guilt, and both the e-mail and the LinkedIn material called Carpenter's testimony into question. The e-mail directly contradicted his trial testimony about the cause and manner of death, making that trial testimony significantly less believable. The LinkedIn material created doubts about Carpenter's reasoning process—about whether he had a solid, traditional scientific basis for his opinions, as opposed to opinions based on an eccentric and controversial view of science and medicine."

Defendant overstates the importance of the excluded evidence. Although the expert witnesses disagreed whether rib fractures like Adenalie's were usually caused by violent shaking versus compression, there was no question Adenalie had 16 healing rib fractures that were at least 10 days old, she did not have fractured ribs when released from the hospital following her birth, and she had no signs of injury when seen at the emergency room in mid-September. Both expert witnesses also agreed that Adenalie was severely emaciated and her most immediate cause of death was overwhelming infection with malnourishment or dehydration as a contributing factor. Further, they agreed her death could not be considered natural under the circumstances, and her conditions were treatable with medical attention. The main disagreement between them was over the manner of death classification and whether there was evidence to link the pneumonia to

the rib fractures, which was the basis for Dr. Carpenter's conclusion that Adenalie's death could be classified as a medical homicide rather than undetermined.

The jury saw and heard evidence about Adenalie's severe emaciation, her refusal to take her bottle, and her cries of pain in the weeks before her death. They also saw and heard defendant's statement to detectives regarding Leyva's physical abuse of Adenalie and her decline once he started abusing her. Defendant saw Leyva repeatedly choke, shake, and swaddle Adenalie so tightly that she made the same sound as when he choked her, but defendant took no action to protect Adenalie. Defendant knew that despite being previously healthy and taking in four ounces of formula per feeding, Adenalie's food intake dropped, and she was no longer even swallowing during some feedings, the formula simply pooling in her throat. Defendant also knew Adenalie was screaming in pain when touched or moved and defendant thought it was due to harm to Adenalie's throat or stomach from Leyva's abuse.

Given the strength of the evidence before the jury in this case, admission of Dr. Carpenter's personal opinion, rendered prior to his discovery of the pneumonia, on the strength or weakness of a future criminal case and whether defendant and Leyva should be released from custody would not have resulted in a different verdict. Nor would allowing defense counsel to cross-examine Dr. Carpenter regarding his interest in psychotherapy, occult, or mysticism as it related to psychosomatic illness have resulted in a different verdict. In the context of the trial evidence, these would have been inconsequential points.

## II. Defense Counsel's Failure to Impeach D.B. with Criminal History

### A. Background

Next, D.B. had numerous criminal convictions spanning from 1980 to 2016, and defense counsel described D.B. as "a career criminal" outside the presence of the jury. Prior to D.B.'s testimony, defendant's counsel expressed intent to impeach D.B. with his convictions during cross-examination. The prosecutor and the trial court noted the

27.

convictions were mostly theft related, and the trial court ruled that defense counsel could ask D.B. whether he had multiple theft convictions over a more than 20-year period, but could not inquire into D.B.'s drug conviction unless D.B. denied his drug use.

D.B. admitted he was a drug user, but defense counsel did not raise the issue of his prior theft convictions. Defendant claims that the failure to do so constituted ineffective assistance of counsel and that it was prejudicial because D.B. "was an important witness" whose testimony "significantly harmed" her.

### B. Legal Principles

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the [effective] assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215; accord, *People v. Waidla* (2000) 22 Cal.4th 690, 718.) To prevail, defendant "'must satisfy a two-pronged showing: that counsel's performance was deficient, and that [the] defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.'" (*People v. Woodruff* (2018) 5 Cal.5th 697, 736, quoting *People v. Alexander* (2010) 49 Cal.4th 846, 888; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Mickel* (2016) 2 Cal.5th 181, 198.) To establish deficient performance, defendant must show that counsel's performance "fell below an objective standard of reasonableness under prevailing professional norms." (*People v. Mai* (2013) 57 Cal.4th 986, 1009; accord, *Strickland v. Washington, supra*, at pp. 687–688; *People v. Mickel, supra*, at p. 198.)

"On appeal, we do not second-guess trial counsel's reasonable tactical decisions." (*People v. Lucas* (2014) 60 Cal.4th 153, 278, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53–54, fn. 19.) "[A] defendant's burden [is] 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence

that counsel had "'"no rational tactical purpose"'" for an action or omission." (*People v. Mickel, supra*, 2 Cal.5th at p. 198, quoting *People v. Lucas* (1995) 12 Cal.4th 415, 437.)

### C. No Error

Trial counsel is presumed competent. (*Strickland v. Washington, supra*, 466 U.S. at p. 690.) "'The failure to impeach a witness or to object to evidence are matters which usually involve tactical decisions on counsel's part and seldom establish a counsel's incompetence.… "'In the heat of a trial, defendant's counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. Except in rare cases an appellate court should not attempt to second-guess trial counsel.…'"'" (*People v. Barnett* (1998) 17 Cal.4th 1044, 1140, quoting *People v. Frierson* (1979) 25 Cal.3d 142, 158.)

We cannot know from the cold record what D.B. looked like or sounded like during his testimony, but he told the jury he was not working and on disability, he had used drugs for a long time, and he was using methamphetamine during the period Adenalie was living at his apartment. He was also vague regarding where he went during the day, stating he did not like to be there and did his own thing. Defense counsel may well have determined that under all of the circumstances, any impeachment value from raising the issue of D.B.'s prior theft convictions was minimal. Counsel may have further concluded as a matter of strategy that any attempt to impeach D.B. with theft convictions might be viewed with disfavor by the jury given the tragedy of Adenalie's death and the gravity of the charges against defendant. Additionally, D.B.'s testimony was corroborated by other witnesses. Although defendant points out that L.L. had not yet testified, defense counsel was aware which witnesses were expected to testify and was aware of his client's statements to detectives.

Because the record here does not affirmatively demonstrate "that counsel had "'"no rational tactical purpose"'" for [the] … omission" (*People v. Mickel, supra*, 2 Cal.5th at p. 198), defendant's claim of error is foreclosed on direct appeal. In addition,

"'[c]ounsel cannot be "ineffective" unless his mistakes have harmed the defense (or, at least, unless it is reasonably likely that they have). Thus, a violation of the Sixth Amendment right to *effective* representation is not "complete" until the defendant is prejudiced.'" (*People v. Hernandez* (2012) 53 Cal.4th 1095, 1105, quoting *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 147; accord, *Weaver v. Massachusetts* (2017) ___ U.S. ___, ___ [137 S.Ct. 1899, 1911].)

When asked how he knew Adenalie was sick, D.B. testified, "I ain't no doctor but I ain't no fool either." Defendant notes the prosecutor emphasized this statement during closing argument. While a memorable response, the substance of D.B.'s testimony was corroborated by other witnesses; jurors were able to see what Adenalie looked like when she died; they were aware that at the time of her death, she weighed even less than her birth weight despite having been just over seven pounds only six weeks earlier; and they had defendant's damaging statement to detectives for consideration. There is simply no reasonable probability the outcome would have been different in this case had defense counsel impeached D.B. with his history of theft convictions. (*People v. Woodruff, supra*, 5 Cal.5th at p. 736.)

## III. Cumulative Error

Defendant also claims cumulative error, which "is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant." (*People v. Capers* (2019) 7 Cal.5th 989, 1017; accord, *People v. Winbush* (2017) 2 Cal.5th 402, 487; *People v. Hinton* (2006) 37 Cal.4th 839, 897.) Given the absence of any errors to aggregate, defendant's cumulative error claim necessarily fails (*People v. Capers, supra*, at p. 1017), but even if we assume error, as we have done herein, the errors "are cumulatively harmless beyond a reasonable doubt, and did not undermine the fundamental fairness of [the] defendant['s] trial" (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 866).

## IV.    Assembly Bill 518

Finally, the trial court sentenced defendant to the mandatory term of 25-years-to-life on count 2 and stayed her mandatory sentence of 15-years-to-life on count 1 pursuant to section 654.  At the time of sentencing, former section 654 provided, in relevant part, "An act or omission that is punishable in different ways by different provisions of law *shall be punished under the provision that provides for the longest potential term of imprisonment*, but in no case shall the act or omission be punished under more than one provision."  (§ 654, former subd. (a), italics added.)  As amended by Assembly Bill 518 effective January 1, 2022, section 654 now provides, in relevant part, "An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision."  (§ 654, subd. (a), italics added.)

Pursuant to *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), "[n]ewly enacted legislation lessening criminal punishment or reducing criminal liability presumptively applies to all cases not yet final on appeal at the time of the legislation's effective date." (*People v. Gentile* (2020) 10 Cal.5th 830, 852, citing *Estrada, supra*, at pp. 744–745; accord, *People v. Esquivel* (2021) 11 Cal.5th 671, 673 & 675–676.)  "This presumption 'rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.'"  (*People v. Gentile, supra*, at p. 852; accord, *People v. Esquivel, supra*, at p. 675.)

The parties agree that Assembly Bill 518 applies in this nonfinal case pursuant to *Estrada* and that remand for resentencing is the appropriate remedy.  ""Defendants are entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court""" (*People v. Flores* (2020) 9 Cal.5th 371, 431–432, quoting *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391), unless it is clear from the record that "remand

would be an idle act" (*People v. Flores, supra*, at p. 432, citing *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425).  The record does not indicate remand would be idle in this case and, therefore, we accept the People's concessions on retroactivity and necessity of remand.  (*People v. Sek* (2022) 74 Cal.App.5th 657, 673–674;  accord, *People v. Mendoza* (2022) 74 Cal.App.5th 843, 861–862; *People v. Mani* (2022) 74 Cal.App.5th 343, 379–380.)

## DISPOSITION

This matter is remanded to the trial court for resentencing in light of Assembly Bill 518.  The judgment is otherwise affirmed.

MEEHAN, J.

WE CONCUR:

DETJEN, Acting P. J.

FRANSON, J.